Rose SCHWABENBAUER,
Plaintiff-Appellee,

v.

BOARD OF EDUCATION OF the CITY
SCHOOL DISTRICT OF the CITY OF
OLEAN, and Harry S. Leonelli, Charles
L. Kinney, Mary Chicola, Martin Far-
agher, Della Moore, Edward H. Radigan,
Paul J. Schafer, John J. Sheehan, Nor-
man R. Utecht, all as members of the
Board of Education of the City School
District of the City of Olean, Defend-
ants-Appellants.

No. 58, Docket 80–7853.

United States Court of Appeals,
Second Circuit.

Argued Oct. 16, 1981.

Decided Dec. 17, 1981.

H. Kenneth Schroeder, Jr., Buffalo, N. Y. (Anne S. Simet, Hodgson, Russ, Andrews, Woods & Goodyear, Buffalo, N. Y., on the brief), for defendants-appellants.

Emanuel Tabachnick, Williamsville, N. Y. (Bernard F. Ashe, Albany, N. Y., on the brief), for plaintiff-appellee.

Before KAUFMAN, OAKES and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

Defendants, the Board of Education of the City School District of the City of Olean and its members (collectively the "Board"), appeal from a final judgment of the United States District Court for the Western District of New York, John T. Elfvin, *Judge*, entered on the motion of plaintiff Rose Schwabenbauer, a teacher, for summary judgment. Schwabenbauer contended that the Board's termination of her employment constituted discriminatory treatment on the basis of her sex, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e to 2000e–17 (1976). The district court agreed and awarded Schwa-

benbauer backpay, attorneys' fees, and reinstatement with tenure and seniority. Finding that summary judgment was improperly granted, we vacate the judgment and remand for such further proceedings as may be appropriate.

## BACKGROUND

Certain facts are not in dispute. In 1968, the Board hired Schwabenbauer as a probationary elementary school teacher to commence September 1, 1968. At that time New York law required a new teacher to serve a three-year probationary period during which his or her performance could be observed and evaluated before a tenure decision was made by a board of education. *See* New York Education Law § 2509 (McKinney 1970). Schwabenbauer taught until February 1, 1970, a period of one year and five months, when she was granted, at her request, a maternity leave of absence for a period of up to two years. Schwabenbauer unexpectedly gave birth prematurely on February 7, 1970, and suffered adverse medical consequences; on her doctor's orders, she remained on leave for the remainder of the school year.[1]

At Schwabenbauer's request the Board terminated her maternity leave as of September 1, 1970. Schwabenbauer returned to work on that date and worked until May 15, 1972, when she received notice from the Board that she would not receive tenure and that her employment would be terminated on June 30, 1972.

Schwabenbauer then began a series of attempts to gain reinstatement.[2] She contended that her three-year probationary period, which had commenced on September 1, 1968, should have ended on August 31, 1971. She asserted that because at the end of that period she was neither expressly granted tenure nor terminated but was permitted to continue teaching, she gained tenure by operation of law, sometimes called tenure by acquiescence.[3] The Board took the position that Schwabenbauer's probationary period did not end on August 31, 1971, because that period had been tolled by her lengthy maternity leave (and thence further extended to June 30, 1972, by virtue of amendments to New York law[4]). In the present lawsuit, Schwabenbauer contends that, by denying credit for her pregnancy leave while granting credit for other lengthy medical leaves, the Board discrimi-

---

1. Although the Board has stipulated to these medical facts, it challenges their relevance in characterizing Schwabenbauer's leave since it is undisputed that Schwabenbauer's original request, prior to commencing her leave, was for an authorized absence of up to two years.

2. First, along with seven other probationers whose employment by the Board also had been terminated as of June 30, 1972, Schwabenbauer filed a grievance in accordance with the collective bargaining agreement then in effect. At the outset of the scheduled arbitration Schwabenbauer withdrew her grievance and sought redress from the New York Commissioner of Education. After failing to obtain relief from the Commissioner she pursued her claim before the New York Division of Human Rights, the New York courts, and the Equal Employment Opportunity Commission ("EEOC").

3. *See, e.g., Marcus v. Board of Education,* 64 A.D.2d 475, 477, 410 N.Y.S.2d 178, 180 (3d Dept. 1978):

   Tenure may be acquired in two ways: by specific award of the board of education or by acquiescence. As noted by the Commissioner of Education in *Matter of Macera* (10

Ed.Dept.Rep. 232, 233 [1971]): "Tenure by acquiescence results where a teacher continues to teach beyond the expiration of the probationary term with the full knowledge and consent of the board of education where the board has failed to take the action required by law to grant or deny tenure" (*Matter of Downey,* 72 St.Dept.Rep. 29 [1951]).

4. In 1971, the New York State Legislature amended the Education Law to increase teacher probationary terms from three years to five years. *See* 1971 N.Y.Laws ch. 116, § 8. This increase did not apply to teachers who completed their probationary periods prior to October 1, 1971. 1971 N.Y.Laws ch. 1102, § 1. Further, as to teachers whose three-year probationary periods had begun before May 9, 1971, and were to end between October 1, 1971, and June 30, 1972, the new law extended the probationary periods to June 30, 1972. 1972 N.Y. Laws ch. 953, § 5. Schwabenbauer concedes that if she is not entitled to credit for her maternity leave, her probationary period was extended to June 30, 1972, and the termination of her employment was valid.

nated against her on the basis of her sex, in violation of Title VII.[5]

### The Motions for Summary Judgment

Following their agreement to two short stipulations of fact, both sides moved for summary judgment. In principal part the stipulations described the Board's treatment of two other female probationary teachers each of whom had been granted tenure on the third anniversary of her appointment despite a disability leave of absence lasting approximately three months. One was Kathryn L. Kenney, who was appointed as of September 1, 1968, and did not work from September 1, 1968, through December 6, 1968, due to illness (the nature of which was not specified in the stipulation), but was granted tenure effective September 1, 1971. The other, Mary Elizabeth Smith, was appointed as of September 1, 1952, was injured in an automobile accident on December 21, 1952, and did not work from December 1, 1952, to March 26, 1953; she was nevertheless granted tenure effective September 1, 1955.[6]

Schwabenbauer contended that the Board's granting of credit to Smith and Kenney for the periods during which they were absent with non-pregnancy-related disabilities and the denial of similar credit to plaintiff for her absence for disability due to pregnancy demonstrated a Board policy of sex discrimination in violation of Title VII. She moved for summary judgment on the ground that no material facts were in dispute.

The Board cross-moved for summary judgment, on the ground that the undisputed material facts failed to establish a prima facie case of discrimination on the basis of sex. First, it contended that the 1952–55 events involving Smith, which predated Title VII by a decade, were so remote as to be worthless as proof of discriminatory treatment of Schwabenbauer, or as proof of a Board policy of discrimination, in the 1970's. Second, the Board contended that, even giving full play to the Board's treatment of Smith and Kenney, plaintiff's evidence showed, at best, discrimination among women, and that gender discrimination could not be proven by showing that some women were treated differently from other women. Third, the Board argued that the cases of Kenney and Smith were distinguishable from that of Schwabenbauer because their leaves were shorter than Schwabenbauer's and did not occur in the middle of their probationary terms, making evaluation of their abilities easier.

### The District Court's Decision

The district court, in an opinion reported at 498 F.Supp. 119, granted summary judgment to Schwabenbauer. Noting that the parties had "agreed that [the] stipulations constitute[d] all the evidence in this case and that, accordingly, I should grant summary judgment on the existing record for one party or the other," *id.* at 120, the court stated that the "decision must be based on these facts [and] on whatever inferences I may permissibly draw from them." *Id.*

Focusing on the Board's treatment of Kenney and Smith, in 1971 and 1955, respectively, the court "as a trier of fact," *id.* at 121, inferred "that defendants had an informal, unwritten, generally sex-neutral policy of including disability leave time but that such policy was not extended to leaves due to pregnancy," *id.*, and it therefore ruled that Schwabenbauer had established a prima facie case of sex discrimination. Rejecting the Board's argument that the

---

**5.** Title VII became applicable to governments and their agencies and subdivisions on March 24, 1972. Equal Employment Opportunity Act of 1972, Pub.L.No.92–261, § 2(1), 86 Stat. 103 (amending 42 U.S.C. § 2000e(a) (1970)). Thus the Board was subject to Title VII at the time it notified Schwabenbauer of its decision to deny her tenure and terminate her employment. The Board has not questioned the applicability of Title VII to its actions.

**6.** No explanation was provided for Smith's failure to work from December 1 until her accident on December 21. Since the record contains an affidavit by Smith stating that her absence lasted 52 school days, it may well be that the December 1 date in the stipulation is a typographical error.

1952–55 events concerning Smith were too stale to be probative of any forbidden discrimination, the court stated that the Board had "offer[ed] no factual support for its contention that this incident is not fully reflective of a policy then and now in force." *Id.* at 120.

The court also discounted the Board's argument that Schwabenbauer had presented no evidence to show that she had been treated differently from any man, pointing out that the Board had presented no evidence to show that men would not have been given the same treatment as Kenney and Smith. And as to the Board's contention that the length and timing of the Smith and Kenney absences were significantly different, the court stated that the Board had made no evidentiary showing that such differences were in fact the reasons for the Board's actions, and that the Board had therefore failed to rebut Schwabenbauer's prima facie case.

Holding that the Board's refusal to grant credit to Schwabenbauer for her maternity leave was unlawful, the court restored the credit, concluded that her probationary period had ended on August 31, 1971, and ruled that on September 1, 1971, Schwabenbauer had acquired tenure by acquiescence, *see* note 3, *supra*. The court ordered the Board to reinstate Schwabenbauer with seniority from September 1, 1968, and to pay her backpay totaling $123,555, plus interest, and attorneys' fees.

Because the record below cannot support a grant of summary judgment, we vacate the judgment and remand for further proceedings.

## DISCUSSION

### A. *The Substantive Framework*

■ Section 703(a) of Title VII, enacted in 1964 as part of the Civil Rights Act, makes it unlawful for an employer to discriminate against an employee "because of . . . sex":

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a). To establish a prima facie case of sex discrimination under § 703(a) a female plaintiff may show that she was treated less favorably than men in circumstances from which a gender-based motive could be inferred (a "disparate-treatment" claim), or she may show that an employment practice that is facially neutral in its treatment of men and women in fact falls more harshly on women than on men (a "disparate-impact" claim). *See International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335–36 n.15, 349, 97 S.Ct. 1843, 1854 n.15, 1861, 52 L.Ed.2d 396 (1977); *Dothard v. Rawlinson*, 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977) (impact case); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–06, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973) (treatment case). For a plaintiff to prevail in a disparate-treatment case, "[p]roof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment." *Teamsters, supra*, 431 U.S. at 335 n.15, 97 S.Ct. at 1854 n.15. In a disparate-impact case, proof of discriminatory motive is not required. *Id.* at 336 n.15, 97 S.Ct. at 1854 n.15.

■ In the two types of cases the allocations of the evidentiary burdens between plaintiff and defendant are similar. In each, once a plaintiff has established a prima facie case of sex discrimination, the burden shifts to the defendant to make a showing in rebuttal; the nature of the rebuttal issues, however, varies in the two

types of cases. In a treatment case, the defendant must show a non-gender-based motive for its treatment of the plaintiff. *See McDonnell Douglas v. Green, supra.* In an impact case, the defendant may not rebut simply by showing any nondiscriminatory motive; rather it must show either that the challenged policy had a "manifest relationship to the employment in question," *Griggs v. Duke Power Co.,* 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971), or that its business necessitated the adoption of such a policy, *Nashville Gas Co. v. Satty,* 434 U.S. 136, 143, 98 S.Ct. 347, 352, 54 L.Ed.2d 356 (1977). Finally, in either a treatment or an impact case, if a defendant has made a rebuttal, the plaintiff has the opportunity to show that the facts offered in rebuttal were merely a pretext for discrimination. *McDonnell Douglas v. Green, supra* (treatment case); *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975) (impact case).

### 1. *Principles Relating to Pregnancy*

At the times pertinent to the present case, Title VII did not specify whether or not an employer's differentiation between disabilities relating to pregnancy and disabilities relating to other conditions was intended to constitute discrimination because of sex.[7] In the circumstances of Title VII's silence as to pregnancy, the Supreme Court

ruled that an employer's exclusion of pregnancy-related benefits from coverage under disability-benefit plans did not constitute discrimination in terms or privileges of employment "because of ... sex" within the meaning of § 703(a)(1). *General Electric Co. v. Gilbert,* 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976). Relying on concepts it had developed in reviewing a nearly identical plan in *Geduldig v. Aiello,* 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974), which had been challenged under the Constitution rather than under Title VII,[8] the *Gilbert* Court concluded, first, that the exclusion of pregnancy-related disabilities from coverage was not discriminatory in its terms:

> "While it is true that only women can become pregnant, it does not follow that every legislative classification concerning pregnancy is a sex-based classification. [...]
>
> "The lack of identity between the excluded disability and gender as such under this insurance program becomes clear upon the most cursory analysis. The program divides potential recipients into two groups—pregnant women and nonpregnant persons. While the first group is exclusively female, the second includes members of both sexes."

*Id.* at 134–35, 97 S.Ct. at 407 (quoting *Geduldig v. Aiello,* 417 U.S. at 496–97 n.20, 94 S.Ct. at 2491–92 n.20). In thus ruling

---

**7.** As of April 29, 1979, Title VII was amended to provide, in relevant part that women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, ....

Act of October 31, 1978, Pub.L.No. 95–555, § 1, 92 Stat. 2076, 42 U.S.C. § 2000e(k) (Supp. III 1979). Since Congress provided that the amendment would take effect on the date of its enactment, Act of 1978, § 2(a) (except as to certain benefit programs in effect on the enactment date, as to which effectiveness was delayed 180 days, *id.* § 2(b)), there is no basis for applying the 1979 amendment to Schwabenbauer's experiences in 1968–72. *Condit v. United Air Lines, Inc.,* 631 F.2d 1136, 1139–40 (4th Cir. 1980). Cases such as *Fusari v. Steinberg,* 419 U.S. 379, 387, 95 S.Ct. 533, 538, 42

L.Ed.2d 521 (1975), and *Diffenderfer v. Central Baptist Church,* 404 U.S. 412, 414, 92 S.Ct. 574, 575, 30 L.Ed.2d 567 (1972) (per curiam), relied on by Schwabenbauer in seeking retroactive application of the 1979 amendment to her case, are inapposite. Those cases did not hold that a prospective statute invalidated past conduct; they held simply that in reviewing a ruling on a request for declaratory or injunctive relief against enforcement of a statute, the appellate court must make its judgment based on the law as it exists at the time of its own decision, rather than on the law that existed when the case was before the lower court.

**8.** In *Geduldig* the Court held that the exclusion of pregnancy-related conditions from coverage under state-sponsored disability benefit plans did not invidiously discriminate against women in violation of the Equal Protection Clause of the Fourteenth Amendment.

that distinctions based solely on pregnancy are facially neutral, the Court in effect eliminated the possibility, under the law as it existed prior to 1979, *see* note 7 *supra*, that a plaintiff complaining only of such a distinction could prevail on a claim of disparate treatment.

The *Gilbert* Court then proceeded, on the basis of disparate-impact analysis, to assess the effect of General Electric's policy of excluding pregnancy-related disabilities from its benefit plans. In *Geduldig* the Court had found the virtually identical plan to have no discriminatory effect:

> There is no evidence in the record that the selection of the risks insured by the program worked to discriminate against any definable group or class in terms of the aggregate risk protection derived by that group or class from the program. There is no risk from which men are protected and women are not. Likewise, there is no risk from which women are protected and men are not.

417 U.S. at 496–97, 94 S.Ct. at 2491–92 (quoted in *Gilbert*, 429 U.S. at 135, 97 S.Ct. at 407). In *Gilbert* the Court similarly observed that both men and women were subject generally to the disabilities that were covered by the General Electric plan, and that there was no evidence that men received more benefits from the disability fund than did women. 429 U.S. at 138, 97 S.Ct. at 409. It found, therefore, that the General Electric plan was nondiscriminatory in its effect. Having noted that if an employer's policy is not discriminatory in either its terms or its effect it cannot violate § 703(a)(1), *id.* at 137–38 n.15, 97 S.Ct. at 408–09 n.15, the Court thus concluded that the General Electric plan was not unlawful.

In *Nashville Gas Co. v. Satty, supra*, the Court reviewed a different kind of practice,[9] challenged under § 703(a)(2). In *Sat-*

ty, the employer's policy required a pregnant worker to take a formal leave of absence; while on pregnancy leave, the employee did not accrue seniority, and she lost all previously accrued seniority. She could not regain lost seniority for the purpose of bidding on future job openings, all of which were filled on the basis of the seniority of the applicants. In contrast, any employee, male or female, who took a leave of absence because of a disease or disability other than pregnancy, retained all accumulated seniority and indeed continued to accrue seniority while on leave. The direct effects of this policy were that an employee returning from a pregnancy leave was not assured of any permanent job, and that any employee who had ever taken a pregnancy leave could not outbid, for a vacant position, any employee hired while she was on leave. Although stating that Nashville Gas's policy was facially neutral, because the preferences granted to those on nonpregnancy leaves applied to men and women alike, the Court concluded that the deprivation of accumulated seniority upon taking a pregnancy leave tended to deprive women of permanent jobs with the company. Further, to the extent that women regained permanent positions, the deprivation tended to relegate them to jobs of lower status. In ruling that the employment disadvantages thereby imposed on women were not permitted by § 703(a)(2), the Court pointed out certain differences between the *Satty* plan and the plan upheld in *Gilbert*:

> In *Gilbert, supra*, there was no showing that General Electric's policy of compensating for all non-job-related disabilities except pregnancy favored men over women. No evidence was produced to suggest that men received more benefits from General Electric's disability insurance fund than did women; both men and women were subject generally to the dis-

---

**9.** Satty also attacked Nashville Gas's refusal to provide sick leave pay for pregnant employees although such pay was given to employees absent for other diseases or disabilities. The Court described the program as "legally indistinguishable" from that upheld in *Gilbert*. It thus rejected the plaintiff's arguments that she

had proven a discriminatory purpose or effect, but remanded for a determination of whether further proceedings might be appropriate as to whether the sick pay plan was merely a pretext designed to disadvantage women. *Id.* at 143–46, 97 S.Ct. at 411–13.

abilities covered and presumably drew similar amounts from the insurance fund. We therefore upheld the plan under Title VII. . . .

Here, by comparison, petitioner has not merely refused to extend to women a benefit that men cannot and do not receive, but has imposed on women a substantial burden that men need not suffer. The distinction between benefits and burdens is more than one of semantics. We held in *Gilbert* that § 703(a)(1) did not require that greater economic benefits be paid to one sex or the other "because of their differing roles in 'the scheme of human existence,'" 429 U.S., at 139 n.17 [97 S.Ct. at 409 n.17]. But that holding does not allow us to read § 703(a)(2) to permit an employer to burden female employees in such a way as to deprive them of employment opportunities because of their different role.

434 U.S. at 141–42, 98 S.Ct. at 351 (footnote omitted). Since no business necessity had been shown for Nashville Gas's seniority policies, the Court upheld the rulings of the lower courts that those policies violated Title VII.

### 2. *Title VII Issues in the Present Case*

■ In determining whether or not the Board's refusal to grant credit to Schwabenbauer for her maternity leave violated Title VII, the court must, in light of the teachings of *Gilbert* and *Satty*, pursue several lines of inquiry. Assuming that there is an identifiable Board policy (*but see* part B, *infra*), the first inquiry is whether its terms discriminate because of sex. We think it clear that the policy as alleged by Schwabenbauer and found by the district court in this case did not so discriminate by its terms. That policy is not simply to grant credit to men while denying it to women. Rather, the assumed Board policy divides probationers, "'into two groups— pregnant women and nonpregnant persons. While the first group is exclusively female,

the second includes members of both sexes.'" *Gilbert, supra,* 429 U.S. at 135, 97 S.Ct. at 407 (quoting *Geduldig,* 417 U.S. at 496–97 n.20, 94 S.Ct. at 2491–92 n.20). Thus, while Schwabenbauer perceives of her case as asserting a claim of disparate treatment and the district court appears to have referred to disparate-treatment issues,[10] the Board's assumed policy is facially neutral, and a disparate-treatment claim is thus foreclosed under *Gilbert.* Disparate-impact analysis, therefore, is appropriate, and the court must determine whether the Board's policy had a discriminatory effect.

In granting judgment for Schwabenbauer the district court viewed the Board's policy as more analogous to the policy of Nashville Gas in *Satty* than to that of General Electric in *Gilbert,* and appears to have assumed that the discriminatory impact that was obvious in *Satty* existed here as well. In the abstract, we agree that a policy of denying credit for maternity leave while granting it for other types of leave does not deny or confer fringe benefits so much as it affects the status of the probationary teacher; indeed, the direct purpose and effect of denying credit are to require that the probationary teacher remain, for a longer period, an untenured probationer. Nevertheless, the analogy to *Satty* is not so perfect that discriminatory impact is to be presumed from the Board's policy. First, a policy of denying or granting probationary credit for maternity and other types of leave is more like that portion of Nashville Gas's policy that simply denied continuing accumulation of seniority to those on maternity leaves while granting such accumulation to those on nonmaternity leaves. Since it is not claimed here that the Board's policy strips pregnant probationers of credit for their teaching time prior to taking leave, its policy is not analogous to Nashville Gas's policy of depriving pregnant employees of their previously accumulated leave. In recognizing the obvious adverse

---

**10.** Having determined that the Board's policy was facially neutral, a conclusion which mandates an impact analysis, the Court suggested that the Board's rebuttal evidence should have proven nondiscriminatory motive, which would be appropriate in a disparate treatment case but is not precisely the issue in an impact case.

impact of Nashville Gas's policy on the status and employment opportunities of women, the *Satty* Court focused more closely on the deprivation feature than on the nonaccumulation feature. *See* 434 U.S. at 141, 98 S.Ct. at 350. While the Court might well have reached the same result solely on the basis of the preferential accumulation-during-leave rules,[11] a policy of nonaccumulation is not as obviously a "burden" as is a policy of stripping away credit for any period previously served. Further, there are sufficient questions as to the precise nature of the Board's policy in the present case that even its analogue to *Satty's* simple nonaccumulation policy may not be perfect. In short, the court must analyze whether the effect of the Board's policy is to favor men over women or to affect adversely the status or job opportunities of women as compared to men.

■ Assuming that the Board's policy is found to have a discriminatory effect, so that the plaintiff has made out a prima facie case of disparate impact, the court must determine whether or not there was a business necessity justifying the policy. As the *Satty* Court observed.

> Recognition that petitioner's facially neutral seniority system does deprive women of employment opportunities because of their sex does not end the inquiry under § 703(a)(2) of Title VII. If a company's business necessitates the adoption of particular leave policies, Title VII does not prohibit the company from applying these policies to all leaves of absence, including pregnancy leaves; Title VII is not violated even though the policies may burden female employees.

434 U.S. at 143, 94 S.Ct. at 352 (citations omitted). And finally, if the Board rebuts a prima facie case by demonstrating a business necessity, Schwabenbauer must be given the opportunity to show that the claimed necessity is merely a pretext for discriminating on the basis of sex.

### B. *Summary Judgement Principles*

■ The requirements for granting summary judgment are well established. There must be "no genuine issue as to any material fact," and a party must be "entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.' *Heyman v. Commerce & Industry Insurance Co.*, 524 F.2d 1317, 1319–20 (2d Cir. 1975)." *American International Group, Inc. v. London American International Corp.*, 664 F.2d 348 (2d Cir. 1981). Not only must there be no genuine issue as to the evidentiary facts, but there must also be no controversy as to the inferences to be drawn from them. *E.g., Phoenix Savings & Loan, Inc. v. Aetna Casualty & Surety Co.*, 381 F.2d 245, 249 (4th Cir. 1967). In determining whether or not there is a genuine factual issue, the court should resolve all ambiguities and draw all reasonable inferences against the moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam); *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980).

■ The contention of one party that there are no issues of material fact preventing entry of judgment in its favor does not bar that party from asserting that there are issues of fact sufficient to prevent the entry of judgment as a matter of law against it. *Walling v. Richmond Screw Anchor Co.*, 154 F.2d 780, 784 (2d Cir.), *cert. denied*, 328 U.S. 870, 66 S.Ct. 1383, 90 L.Ed. 1640 (1946). Thus, the fact that both sides have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other. *E.g., Home Insurance Co. v. Aetna Casualty &*

---

11. Certainly the same result would be justified by the breadth of the EEOC regulations which the *Satty* Court found to support its decision:

> 1972 guidelines of the EEOC specify that "[w]ritten and unwritten employment policies and practices involving ... the accrual of seniority ... and reinstatement ... shall be applied to disability due to pregnancy or childbirth on the same terms and conditions as they are applied to other temporary disabilities." 29 CFR § 1604.10(b) (1976).

434 U.S. at 142 n.4, 98 S.Ct. at 351 n.4 (ellipses in opinion).

*Surety Co.*, 528 F.2d 1388, 1390 (2d Cir. 1976) ("The fact that both sides . . . sought summary judgment does not make it more readily available."); *Rhoads v. McFerran*, 517 F.2d 66, 67 (2d Cir. 1975). Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.

██ Applying these principles within the framework of the Title VII analysis mandated by *Gilbert* and *Satty*, we conclude that the district court erred in granting summary judgment in favor of Schwabenbauer. The rather sketchy evidence and the sparse stipulations of fact entered into by the parties simply did not permit the kind of analysis required.[12] Specifically, we note four areas in which material factual issues should have prevented entry of judgment as a matter of law for Schwabenbauer.

First, there is the threshold question of whether there existed a Board policy regarding the granting of credit for leaves of absence during a probationary period. Plaintiff offered no documents, testimony, or affidavits attesting to an actual Board policy. The court had before it just three instances in which the Board acted to grant or deny such credit, which were inadequate to justify the inference of a policy as a matter of law. Although the contemporaneous different treatments of Schwabenbauer and Kenney may *permit* the inference that the Board had a defined policy regarding credit for leaves during a probationary period, such an inference is scarcely compelled. The evidence as to Smith is even less probative. While Smith was

granted credit in the 1950's there is no evidence that credit for a pregnancy leave had ever before been denied to anyone, or that such credit was thereafter denied to anyone within the next eighteen years. The isolated evidence as to Smith therefore hardly even permits an inference of a defined Board policy in the 1950's. Rather than inferring from these three instances that the Board "had an informal, unwritten . . . policy," "then and now," the court was required, in ruling on Schwabenbauer's motion, to draw all reasonable inferences in favor of the Board. Had it done so, it would have concluded that a question existed as to whether in fact the Board had a defined policy respecting the granting of credit for leaves during a probationary period.

Second, assuming that the circumstances of Smith, Kenney, and Schwabenbauer reflect a Board policy, there is the question as to the content of that policy. The district court inferred that it was a "policy of including disability leave time [except for] leaves due to pregnancy." 498 F.Supp. at 121. There are, however, at least two unanswered questions as to the content of the Board policy, one relating to the nature of the leave, and the other relating to the length of the absence. As to the nature of the leave, the cases of Smith and Kenney are clear; theirs were leaves due to disability. Schwabenbauer on the other hand, does not appear to have sought her leave merely for pregnancy related "disability": she requested a leave of absence for a period of up to *two years.* If we assume that disability due to pregnancy, without complications, normally extends for a period of six to eight weeks, *see Gilbert, supra,* 429 U.S.

---

**12.** Thirteen facts were stipulated. Seven of them detailed the probation, leave, and tenure dates of Smith and Kenney. The other six were as follows:

 1. The plaintiff is a female.
 2. The plaintiff at all times relevant to this action was a duly certified teacher in the State of New York within the elementary tenure area.
 3. That the actions complained of by the plaintiff were allegedly committed within the Western District of the State of New York.

 4. Plaintiff gave birth to her child on February 7, 1970 one month earlier than the normal and expected period of gestation.
 5. The plaintiff, because of health complications, and upon the advice of her physician, was unable to return to her teaching position until after June 1970.
 6. On January 11, 1973 the plaintiff filed the instant complaint with the Equal Employment Opportunity Commission.

at 130 n.6, 97 S.Ct. at 405 n.6 (citing district court's finding of fact), the nature of the leave granted to Schwabenbauer—and hence the Board's policy regarding it—was ambiguous. In ruling on Schwabenbauer's motion, the court should have resolved any ambiguity in favor of the Board. As to length of absence, the disability leaves for which the Board has granted credit lasted three months, while Schwabenbauer's leave, as it turned out, lasted seven months.[13] Had the court drawn reasonable inferences in the Board's favor rather than against it, the court might have concluded, for example, that the Board's policy was to grant credit to any probationer who took any type of leave, including maternity leave, for some three months, but to deny credit to any probationer, male or female, whose leave for any reason lasted more than a few months. While such inferences favoring the Board would not have been proper in assessing the Board's own motion for summary judgment, they should nevertheless have prevented the granting of summary judgment against it.

Third, assuming that there was a Board policy, and that in general it denied credit for pregnancy leaves while granting credit for other types of leave, the question remains whether the Board's policy had the effect of discriminating against women because of their sex. There is no evidence in the record from which this question could have been answered. The only proof offered showed credit granted or denied to women and the tenure decisions as to those three women. As to possible gender-discriminatory effects of the assumed policy, it cannot be determined from the present record, for example, whether on the average it

takes women significantly longer than men to complete their probationary periods, whether proportionately more women than men fail to gain tenure at the end of their probationary periods, whether a longer probationary period reduces the likelihood that tenure will be granted, whether a longer probationary period adversely affects seniority, whether a longer probationary period adversely affects other job opportunities, and so forth. In the absence of any answers to questions such as these there can be no finding of a gender-based effect.

Finally, if the Board's leave policy is found to have an adverse effect on women, thereby establishing a prima facie case, the Board may nevertheless be able to defend successfully if that policy was adopted because of business necessity. The Board contended, for example, that too long a leave by a probationary teacher hampers the school board's evaluation efforts that are required by law. The record before the court revealed that Schwabenbauer's leave, as taken, was more than twice as long as those of Smith and Kenney; and as originally requested Schwabenbauer's leave could have lasted two years. Viewing these facts in light of the requirement of New York's Education Law that the Board evaluate teachers for a three-year probationary period, and of the ruling of the New York Commissioner of Education that substantial leaves other than for military service may not be counted toward completion of this period, *see In re Luchans*, 2 Educ.Dept.Rep. 424 (1963), the rejection of a business necessity defense as a matter of law was improper.

In vacating the judgment entered in favor of Schwabenbauer,[14] we have not suggested that summary judgment should nec-

---

**13.** Although Schwabenbauer characterizes her leave as a "five-month" disability leave, her leave began on February 1, 1970, and ended on September 1, 1970, and hence was in fact a seven-month leave. We understand Schwabenbauer to argue that only five months of this period constituted a leave for "disability," and we infer that her request that the leave terminate on September 1, rather than July 1 when she implies she was able to return to work, reflected recognition that otherwise the Board could have required her to teach summer

school, *see In re Greebel*, 14 Educ.Dept.Rep. 305, 307 (1975). In any event, in inferring the content of a Board policy and assessing its business necessity, especially in the context of Schwabenbauer's motion for summary judgment, it is appropriate to recognize that Schwabenbauer in fact took a seven-month leave.

**14.** Since plaintiff is no longer the "prevailing party", we also vacate the district court's award of attorneys' fees under 42 U.S.C. § 2000e–5(k) (1976).

essarily have been granted against her, having noted inferences that, if properly drawn in her favor, would support certain elements of her claim. Nevertheless, we note that the district court's opinion stated that the parties had "agreed that [the] stipulations constitute all the evidence in this case." Since that agreement is not part of the stipulations themselves and we find no such written agreement in the record transmitted to this Court, we do not know whether the agreement contemplated only a ruling as to summary judgment, or whether the parties agreed that in the event that the case were tried the evidence to be presented would reflect only the facts recited in the stipulations. We are constrained to observe that such evidence, *see* note 12 *supra,* even as augmented by any other admitted facts of record, would be insufficient to support a judgment in favor of Schwabenbauer, and that if the parties in effect asked the court to try the case on the basis of the stipulated facts, judgment should have been entered in favor of the Board.

## CONCLUSION

The judgment is vacated and the cause remanded for proceedings not inconsistent with this opinion.[15]

---

**15.** In the event that Schwabenbauer should prevail on remand, we think a caveat as to remedy is worthwhile. It is not clear to us that under New York law the doctrine of tenure by acquiescence would be applicable to Schwabenbauer's circumstances since it would depend on the granting of credit for a leave lasting seven months. The New York Commissioner of Education has ruled that "substantial" leaves, other than military, may not be counted toward completion of the probationary period, although "isolated and insignificant" leaves may be so counted. *In re Luchans, supra,* at 426; *see In re Greebel, supra.* In *Luchans,* a nine-month disability leave was considered too substantial to be credited toward completion of the probationary period. In such matters the New York courts accord the Commissioner's views great weight, *e.g., Lezette v. Board of Education,* 35 N.Y.2d 272,

281, 360 N.Y.S.2d 869, 876, 319 N.E.2d 189, 194–95 (1974), and no court has criticized or questioned *Luchans* or adopted a conflicting view.

On the other hand, if the court determines that there has been a violation of § 703(a), Title VII itself gives the court broad discretion to fashion a remedy. *See e.g., Franks v. Bowman Transp. Co.,* 424 U.S. 747, 763–67, 96 S.Ct. 1251, 1263–65, 47 L.Ed.2d 444 (1976); *Albemarle Paper Co. v. Moody, supra.* In determining what relief may be appropriate, the court should bear in mind that Title VII did not become applicable to the Board until March 24, 1972, and should consider whether Schwabenbauer's maternity leave was in fact the reason for the Board's refusal to grant her tenure or whether that leave simply delayed the making of a non-gender-based decision.