895 F.2d 86
 52 Fair Empl.Prac.Cas. 130,
52 Empl. Prac. Dec. P 39,609
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff-Appellee,
v.
JOINT APPRENTICESHIP COMMITTEE OF the JOINT INDUSTRY BOARD
OF the ELECTRICAL INDUSTRY, Defendant-Appellant.
 No. 467, Docket 89-6165.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 30, 1989.
Decided Jan. 31, 1990.
 
 Norman Rothfeld, New York City, for defendant-appellant.
 John F. Suhre, Washington, D.C. (Charles A. Shanor, Gen. Counsel, Gwendolyn Young Reams, Associate Gen. Counsel, Vella M. Fink, Asst. Gen. Counsel, E.E.O.C., Washington, D.C., on the brief), for plaintiff-appellee.
 Before KEARSE, ALTIMARI, and MAHONEY, Circuit Judges.
 KEARSE, Circuit Judge:
 
 
 1
 Defendant Joint Apprenticeship Committee of the Joint Industry Board of the Electrical Industry ("JAC") appeals from orders of the United States District Court for the Southern District of New York, Whitman Knapp, Judge, granting partial summary judgment to plaintiff Equal Employment Opportunity Commission ("EEOC") on EEOC's claim that two of JAC's criteria for entry into its apprenticeship programs discriminate against blacks and women, respectively, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e et seq. (1982) ("Title VII"), and enjoining JAC from imposing those requirements. On appeal, JAC contends principally that the court erred in ruling that EEOC's statistical presentation made out a prima facie case of disparate impact. For the reasons below, we vacate and remand for further proceedings in light of the Supreme Court's recent decision in Wards Cove Packing Co., Inc. v. Atonio, --- U.S. ----, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989) ("Wards Cove").
 
 I. BACKGROUND
 
 2
 JAC is a joint labor-management board that administers training programs for apprentice electricians in the New York City metropolitan area. Successful completion of such a program leads to eligibility for membership in an electrician's union, Local 3 of the International Brotherhood of Electrical Workers.
 
 
 3
 In administering the programs, JAC issued recruitment announcements in 1980, 1981, and 1983. Each announcement stated that applicants would not be accepted in the program unless they, inter alia, (1) possessed a New York State-approved high school or general equivalency diploma, and (2) were no more than 22 years of age if they had not served in the armed forces, or no more than 26 if they were veterans. (The upper age limit was eliminated for classes starting after January 1, 1985, after New York State enacted a statute prohibiting discrimination in admission to apprenticeship programs on the basis of age. N.Y.Exec. Law Sec. 296(1)(a), (b) (McKinney Supp.1989).) Each of JAC's announcements stated that anyone who did not meet the listed criteria should not request an application.
 
 
 4
 In May 1984, EEOC commenced the present action under Title VII. It alleged that JAC's diploma requirement discriminated against blacks and that its age limitation discriminated against women. It requested, inter alia, an injunction and sought monetary relief for individuals adversely affected by the alleged discrimination.
 
 
 5
 After extensive discovery, EEOC moved in 1988 for partial summary judgment on the issue of liability. In support of its motion, EEOC relied principally on statistical analyses of (a) United States Census data as to the relevant pool of potential applicants, (b) the applications received by JAC for the three programs administered in the period 1980-1984, and (c) JAC's rates of acceptance or rejection of the pertinent groups of applicants. These statistics tended to show that blacks and women were underrepresented among those who applied, and that blacks and women who applied were accepted at significantly lower rates than whites and men, respectively.
 
 
 6
 With respect to the claim of racial discrimination, EEOC's statistics revealed that blacks constituted some 18.3 percent of the pertinent pool of potential applicants but only 12.2 percent of the actual applicants to the JAC programs. EEOC argued that "[a]s the percent of black applicants is very different from the expected percent from several estimated pools of potential applicants, a general problem exists as blacks were under-represented as applicants."
 
 
 7
 Further, in the counties from which JAC received applications, 89.2 percent of whites between the ages of 19 and 22 had high school degrees, whereas only 68.3 percent of blacks in the same age group had such degrees. A higher percentage of black applicants (ranging from 3.42 to 6.23 percent) than of white applicants (ranging from 1.79 to 2.13 percent) lacked the mandated high school credentials. EEOC concluded that "the use of the criterion of a high school degree will have an adverse impact on blacks."
 
 
 8
 In addition, EEOC presented statistics to demonstrate the disparity in JAC's evaluations of black and white applicants in each of the three programs administered between 1980 and 1984. Rounded, the statistics revealed that in the first program, 14 percent of the blacks who applied were found acceptable, as contrasted with 31 percent of the whites who applied; in the second program, 16 percent of the blacks who applied were found acceptable, as contrasted with 44 percent of the whites; in the third program, 49 percent of the blacks who applied were found acceptable, as contrasted with 63 percent of the whites.
 
 
 9
 With respect to its claim of gender discrimination, EEOC presented statistics revealing that women constituted some 31.5 percent of the relevant pool of potential applicants but only 2.5 percent of the applicants to the JAC programs. It argued that "[a]s the 2.5 percent of female applicants is very different from the percent in an estimated pool of potential applicants, women were under-represented."
 
 
 10
 The statistics also revealed that a disproportionate number of women above JAC's age limit applied for the three programs. Thus, in the first program, 19.30 percent of the women who applied were above the age limit, as contrasted with 6.04 percent of the men who applied. In the second program, 21.43 percent of the women who applied were above the age limit, as contrasted with 6.02 percent of the men. In the third program, 15.25 percent of the women who applied were above the age limit, as contrasted with 6.33 percent of the men.
 
 
 11
 The analysis of JAC's evaluation of those who applied revealed the following approximate disparities in the acceptance rates for women and men. In the first program, 11 percent of the women who applied were found acceptable, as contrasted with 25 percent of the men who applied. In the second program, 7 percent of the women who applied were found acceptable, as contrasted with 41 percent of the men. In the third program, 22 percent of the women who applied were found acceptable, as contrasted with 62 percent of the men.
 
 
 12
 EEOC contended that its statistics established that "factors related to race and sex" caused blacks and women to be underrepresented among actual applicants and that blacks and women were being excluded from JAC's apprenticeship programs at statistically significant higher rates than whites and men. EEOC argued that its statistics established that JAC's admission policies and procedures had a disparate impact on blacks and women and that EEOC had therefore established a prima facie case of discrimination in violation of Title VII. It requested that the court grant partial summary judgment in its favor on the issue of liability.
 
 
 13
 JAC opposed EEOC's motion principally by challenging the validity of certain of EEOC's statistics. It presented affidavits stating, inter alia, that the pools of potential applicants used by EEOC did not accurately reflect the groups of persons who might realistically be expected to apply for apprenticeships. Thus, JAC contended that EEOC had overstated the percentages of blacks and women who were potential applicants and that EEOC's statistics were insufficient to establish a prima facie case. JAC did not otherwise seek to adduce rebuttal evidence, and it advised the court that it had elected to oppose EEOC's motion solely by contesting EEOC's establishment of a prima facie case.
 
 
 14
 In a Memorandum and Order dated May 1, 1989 ("May 1 Order"), the district court granted EEOC's motion for partial summary judgment. The court determined that EEOC's evidence demonstrated that significantly more whites than blacks in the relevant geographical area had high school diplomas and that significantly more women than men were rejected from the three challenged apprenticeship classes because they exceeded the age limit. In discussing the applicant pool's racial imbalance, the court stated that it was
 
 
 15
 not even necessary to speculate on the degree to which the high school requirement deters blacks without high diplomas [sic] from applying, because the data concerning actual applicants to the three programs show that blacks without high school diplomas apply, and are turned away, at a higher rate than whites without high-school diplomas.
 
 
 16
 Id. at 3. In rejecting JAC's argument that its age requirement did not cause the applicant pool's gender disparity, the court stated as follows:
 
 
 17
 It is not necessary for plaintiffs to explain the disparity on which their prima facie case rests; they must only show that its existence is more probable than not. Eldredge v. Carpenters 46 Northern California Counties Joint Apprenticeship and Training Committee (9th Cir.1987) 833 F.2d 1334, 1340 n. 8, cert. denied (1988) [487 U.S. 1210], 108 S.Ct. 2857 [101 L.Ed.2d 894] ("For purposes of [plaintiff's] prima facie case, ... the issue is not why the [requirement] has a discriminatory impact, rather the issue is simply whether it has such an impact.")
 
 
 18
 May 1 Order at 6 (emphasis in Eldredge).
 
 The court stated that
 
 19
 EEOC has come forward on its motion with sufficient statistical proof that the high school diploma requirement has a disparate impact on blacks, and that the former age maximum had a disparate impact on women during the years in which it was in effect. We conclude that a prima facie case of disparate impact has been made out with respect to both challenged requirements.
 
 
 20
 Id. at 7. The court also concluded that JAC had not cast sufficient doubt on the validity of EEOC's statistics to rebut the prima facie case.
 
 
 21
 On the basis of its May 1 Order, the court entered an Order and Partial Judgment on June 23, 1988 ("June 23 Order"), enjoining JAC from "use of the high school diploma or its equivalency" or "use of the age maximum of 22" as prerequisites for admission into the electrician apprenticeship programs. EEOC's requests for other relief remained pending. This appeal followed.
 
 II. DISCUSSION
 
 22
 On appeal, JAC contends principally that the district court erred in finding that the educational and age prerequisites have any disparate impact on blacks and women. For the reasons below, we conclude that the matter should be remanded to the district court for further proceedings in light of Wards Cove.
 
 A. Appellate Jurisdiction
 
 23
 Preliminarily, we think it advisable to clarify the nature of our jurisdiction to hear the present appeal. Though JAC seeks review principally of the May 1 Order and invokes 28 U.S.C. Sec. 1291 (1982), which gives the courts of appeals jurisdiction to review district courts' final decisions, the May 1 Order granting partial summary judgment was not a final order, for it addressed only the issue of liability and did not fully adjudicate the claims in the case. See, e.g., Liberty Mut. Ins. Co. v. Wetzel, 424 U.S. 737, 744, 96 S.Ct. 1202, 1206, 47 L.Ed.2d 435 (1976) (partial summary judgments "are by their terms interlocutory ... and where assessment of damages or awarding of other relief remains to be resolved [they] have never been considered to be 'final' within the meaning of 28 U.S.C. Sec. 1291"). Although a district court may enter a partial final judgment pursuant to Fed.R.Civ.P. 54(b) in appropriate circumstances, see, e.g., Cullen v. Margiotta, 811 F.2d 698, 710-11 (2d Cir.), cert. denied, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987); Cullen v. Margiotta, 618 F.2d 226, 228 (2d Cir.1980) (per curiam); see also Liberty Mut. Ins. Co. v. Wetzel, 424 U.S. at 742-44, 96 S.Ct. at 1205-07, there was no Rule 54(b) certification in this case.
 
 
 24
 Nonetheless, the court's June 23 Order, which apparently took immediate effect, enjoined JAC from using the challenged criteria. That order was thus an interlocutory injunction that was immediately appealable under 28 U.S.C. Sec. 1292(a)(1) (1982). See Liberty Mut. Ins. Co. v. Wetzel, 424 U.S. at 744, 96 S.Ct. at 1206; Male v. Crossroads Assocs., 469 F.2d 616, 620 (2d Cir.1972).
 
 
 25
 A district court's decision to grant a preliminary injunction may not be overturned on appeal unless the court has abused its discretion. Doran v. Salem Inn, Inc., 422 U.S. 922, 931-32, 95 S.Ct. 2561, 2567-68, 45 L.Ed.2d 648 (1975). An abuse of discretion may be found where the district court has applied incorrect legal standards. See, e.g., Parents' Association of P.S. 16 v. Quinones, 803 F.2d 1235, 1239 (2d Cir.1986); Coca-Cola Co. v. Tropicana Products, Inc., 690 F.2d 312, 315 (2d Cir.1982).
 
 
 26
 In the present case, the June 23 injunction was premised on the May 1 Order's grant of partial summary judgment. Accordingly, in order to determine whether the injunction was granted within a proper legal framework, we will consider, to the extent necessary, the correctness of the May 1 Order.
 
 
 27
 B. Establishing a Prima Facie Case of Disparate Impact
 
 
 28
 Subsequent to the district court's May 1 Order granting partial summary judgment, the Supreme Court decided Wards Cove, 109 S.Ct. 2115, in which it addressed what must be shown in order to establish a prima facie case of employment discrimination under Title VII, based on a theory of disparate impact. The Court indicated that it was not announcing new law but was merely clarifying the existing standards. See id. at 2124.
 
 
 29
 In Wards Cove, the Court noted that "[a]lthough statistical proof can alone make out a prima facie case," id. at 2121 (citing Teamsters v. United States, 431 U.S. 324, 339, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1977), and Hazelwood School District v. United States, 433 U.S. 299, 307-08, 97 S.Ct. 2736, 2741-42, 53 L.Ed.2d 768 (1977)), the prima facie case comprises both disparity and causation:
 
 
 30
 Our disparate-impact cases have always focused on the impact of particular hiring practices on employment opportunities for minorities. Just as an employer cannot escape liability under Title VII by demonstrating that, "at the bottom line," his work force is racially balanced (where particular hiring practices may operate to deprive minorities of employment opportunities) ... a Title VII plaintiff does not make out a case of disparate impact simply by showing that, "at the bottom line," there is racial imbalance in the work force. As a general matter, a plaintiff must demonstrate that it is the application of a specific or particular employment practice that has created the disparate impact under attack. Such a showing is an integral part of the plaintiff's prima facie case in a disparate-impact suit under Title VII.
 
 
 31
 Id. at 2124-25 (emphasis in original). Thus, in remanding the case before it, the Wards Cove Court stated that
 
 
 32
 even if on remand respondents can show that nonwhites are underrepresented in the at-issue jobs ... this alone will not suffice to make out a prima facie case of disparate impact. Respondents will also have to demonstrate that the disparity they complain of is the result of one or more of the employment practices that they are attacking here, specifically showing that each challenged practice has a significantly disparate impact on employment opportunities for whites and nonwhites.
 
 
 33
 Id. at 2125 (emphasis in original). In other words, in order to make out a prima facie case of disparate impact under Title VII, the plaintiff must establish that the challenged employment practice caused the statistical disparity.
 
 
 34
 In the present case, as clarified by Wards Cove, EEOC bore the initial burden of demonstrating not only race and gender disparities but also a causal nexus between those disparities and JAC's diploma and maximum age requirements. It is not at all clear, however, that the district court made its summary judgment decision within this framework, for it appears that the court thought it unnecessary to determine whether the statistical disparities were caused by the challenged criteria. Though the district court stated the conclusions that "the high school diploma requirement has a disparate impact on blacks, and that the former age maximum had a disparate impact on women during the years in which it was in effect," the reasoning that preceded these conclusions appears to disclaim the need for exploration of the causal nexus between criterion and disparity. For example, in addressing JAC's contention that there was no connection between the age limitation and the small percentage of female applicants, the court stated that "[i]t is not necessary for plaintiffs to explain the disparity on which their prima facie case rests; they must only show that its existence is more probable than not."
 
 
 35
 We conclude that the injunction was entered on the basis of a decision that appears not to conform to the applicable legal standard. Accordingly, without reaching any of the parties' other arguments as to the merits of the case, we vacate the May 1 Order and the June 23 injunction, and remand to the district court for further consideration in light of the principles clarified in Wards Cove.
 
 
 36
 In so doing, we express no view as to the sufficiency of EEOC's statistics to establish the requisite disparities, or as to whether summary judgment is appropriate with respect to the issue of causation. See generally Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 465 (2d Cir.1989) (on motion for summary judgment, court is not to resolve issues of fact but only to determine whether there are issues to be tried); Schwabenbauer v. Board of Education, 667 F.2d 305, 313 (2d Cir.1981) ("In determining whether or not there is a genuine factual issue, the court should resolve all ambiguities and draw all reasonable inferences against the moving party.").
 
 
 37
 If it is determined that EEOC has advanced a prima facie case of disparate impact, the burden of production shifts to JAC to produce evidence rebutting the prima facie case. Thus, JAC would then bear the burden of showing that there are "legitimate, nondiscriminatory reasons" for the specific employment practices in question. Watson v. Fort Worth Bank and Trust, 487 U.S. 977, 108 S.Ct. 2777, 2784, 101 L.Ed.2d 827 (1988). However, "the ultimate burden of proving that discrimination against a protected group has been caused by a specific employment practice remains with the plaintiff at all times." Id. at 2790, quoted in Wards Cove, 109 S.Ct. at 2126.
 
 CONCLUSION
 
 38
 For the foregoing reasons, the orders of the district court dated May 1, 1989, and June 23, 1989, are vacated, and the matter is remanded for further proceedings.