Sankar Nath **BANERJEE,**

v.

Melville P. **ROBERTS,** et al.

Civ. No. H–84–1061(JAC).

United States District Court,
D. Connecticut.

July 31, 1986.

Julia L. Aurigemma, F. Patrick O'Sullivan, Hartford, Conn., for plaintiff.

John F. Scully, Jeffrey Pingpank, Hartford, Conn., for defendant Roberts in his individual capacity.

William N. Kleinman, Asst.Atty.Gen., Farmington, Conn., Paul M. Shapiro, Asst. Atty.Gen., Storrs, Conn. (Joseph I. Lieberman, Atty.Gen., Hartford, Conn., of counsel), for trustee defendants and for defendant Roberts in his official capacity.

## RULING ON MOTIONS TO DISMISS OR FOR SUMMARY JUDGMENT

JOSÉ A. CABRANES, District Judge:

TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | Background | 1096 |
| II. | Claims Against the University of Connecticut | 1098 |
| III. | Claims Against the Trustee Defendants | 1099 |
| IV. | The Federal Claims | 1101 |
| V. | The Claims Under State Law | 1104 |

This action was brought by a former neurosurgery resident in the University of Connecticut-Hartford Hospital Neurosurgical Residency Program against the director of that program, the trustees of the University of Connecticut and the university itself. The action is before the court on motions to dismiss or, in the alternative, for summary judgment filed on behalf of the defendants.

### I. *Background*

The plaintiff in this action is Sankar Nath Banerjee, an Indian national who resides in Illinois. *See* Amended Complaint (filed Feb. 8, 1985) ¶ 1. Banerjee entered the four-year University of Connecticut-Hartford Hospital Neurosurgical Residency Program ("the program") in July 1978. *See* Affidavit of Melville P. Roberts (filed March 11, 1985) ("Roberts Affidavit") ¶¶ 8–9. The program director at all times relevant to this action was the defendant Melville P. Roberts.

It is undisputed that Banerjee signed a "residency contract" with Hartford Hospital prior to entering the program. *See* Affidavit in Opposition to Motion for Summary Judgment (filed April 1, 1985) ("Banerjee Affidavit") ¶ 9 and Exhibit A. This agreement provided, *inter alia*, that

> Hartford Hospital hereby agrees to accept Sankar Banerjee as a G2 Resident in the Department of Neurosurgery for a period of July 1, 1978 to June 30, 1982 and to provide an educational program during this period in keeping with the standards established by the Council on Medical Education of the American Medical Association.

*Id.*[1] In addition, Banerjee received a letter from the university notifying him of his

---

[1] The Essentials of Accredited Residencies of the American Medical Association's Committee on Graduate Medical Education that were in effect at the time that the plaintiff commenced his residency provided, *inter alia:*

> The residency agreement imposes ethical, moral and legal obligations upon both the hospital and the resident. No residency should be terminated prior to its expiration date without the opportunity for both parties to discuss freely any differences or grievances that may exist.
>
> Under particular circumstances, the hospital or the resident may be justified in terminating a residency prior to the expiration of its term. If the resident fails to perform the normal and customary services of a residency or fails to comply with the reasonable rules

appointment as a neurosurgery resident and instructing him to accept the appointment in writing by a specified date. *See id.*, Exhibit A. He received similar letters in subsequent years notifying him of his appointments as a second-year, third-year and fourth-year resident. *See id.*, Exhibits D, E and F.

The parties agree that Banerjee asked Roberts at some point in 1978 or 1979 whether he could obtain credit for prior overseas experience. *See* Roberts Affidavit ¶ 8; Banerjee Affidavit ¶¶ 6–7. Banerjee contends that Roberts unconditionally assured him prior to his admission to the program that "I would be required to complete only three and a half of the full four years of the program due to my previous training in general surgery and neurosurgery." Banerjee Affidavit ¶ 7. Roberts concedes that he agreed to look into the possibility of extending credit to Banerjee for his prior surgical experience; however, he contends that he abandoned any intent of awarding such credit once he had observed Banerjee's performance. *See* Roberts Affidavit ¶¶ 9, 11. In any event, Roberts informed Banerjee in October 1981 that he would receive no credit for his prior overseas experience. *See* Banerjee Affidavit ¶ 38.

It is undisputed that Roberts notified Banerjee in November 1981 that he was being dropped from the program effective December 31, 1981. *See* Roberts Affidavit ¶ 43. Banerjee was informed either at that meeting or at some time thereafter that he would not receive credit for the third and fourth years of his residency. *See* Banerjee Affidavit ¶ 42. Roberts contends that these decisions were based on deficiencies in Banerjee's performance as a neurosurgery resident that Roberts had discussed

with Banerjee on a number of earlier occasions. *See* Roberts Affidavit ¶¶ 19, 26–32, 42. However, Banerjee asserts that he was never made aware of any criticisms of his performance either at his November 1981 meeting with Roberts or at any time prior thereto. *See* Banerjee Affidavit ¶¶ 11, 41, 57. Banerjee suggests that the decisions to dismiss him and to deny him credit for the last year and a half of his residency were based not on his performance as a neurosurgery resident but instead on his race or nationality or on his public criticism of "mismanagement" of patients by Roberts and other neurosurgeons who practiced at Hartford Hospital. *See* Amended Complaint ¶ 31; Banerjee Affidavit ¶¶ 17–20.

On March 29, 1982, Banerjee wrote to the American Board of Neurological Surgery complaining that he had been mistreated by Roberts. *See* Banerjee Affidavit ¶ 45. In response, Roberts forwarded to the board several negative evaluations of Banerjee by other neurosurgeons associated with the program. *See id.* at ¶ 47; Roberts Affidavit ¶¶ 44–45. Banerjee contends that he had never seen these evaluations until they were turned over to his counsel in the course of this litigation. *See* Banerjee Affidavit ¶ 47. Moreover, he notes that the evaluations do not make reference to any specific cases in which he performed inadequately and states that he "do[es] not believe that such cases exist." *See id.* at ¶¶ 48–49.

Banerjee commenced this lawsuit on September 28, 1984, against Roberts, the University of Connecticut, and the members of the university's Board of Trustees. The amended complaint asserts twelve causes of action against each of the twenty defendants.

---

that are necessary in the orderly operation of the hospital, the hospital may be justified in taking such action. Likewise, a physician should be entitled to rely upon representations with respect to opportunity for educational experience, conditions of service, living quarters, agreed vacation periods, etc., that are made to induce him to apply for the residency.

Plaintiffs [sic] Supplemental Memorandum of Law (filed June 7, 1985), Exhibit A. The "due process" provisions contained in the Essentials of Accredited Residencies were made more explicit prior to the termination of the plaintiff's residency. *See* Affidavit in Opposition to Motion for Summary Judgment (filed April 1, 1985), Exhibit C.

## II. *Claims Against the University of Connecticut*

■ A federal court is precluded by the Eleventh Amendment to the United States Constitution from considering "any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const., amend. XI. The Eleventh Amendment bar to suit in federal courts extends not only to the state itself but also to any entity that is deemed to be an "arm of the State." *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977).[2]

As the Court of Appeals observed in *Hall v. Medical College of Ohio*, 742 F.2d 299, 301 (6th Cir.1984), *cert. denied*, 469 U.S. 1113, 105 S.Ct. 796, 83 L.Ed.2d 789 (1985), "[t]he great majority of cases addressing the question of Eleventh Amendment immunity for public colleges and universities have found such institutions to be arms of their respective state governments and thus immune from suit." *See, e.g., United Carolina Bank v. Board of Regents*, 665 F.2d 553, 556–560 (5th Cir.1982); *Rutledge v. Arizona Board of Regents*, 660 F.2d 1345, 1349–1350 (9th Cir.1981), *aff'd sub nom. Kush v. Rutledge*, 460 U.S. 719, 103 S.Ct. 1483, 75 L.Ed.2d 413 (1983); *Perez v. Rodriguez Bou*, 575 F.2d 21, 25 (1st Cir.1978); *Brennan v. University of Kansas*, 451 F.2d 1287, 1290–1291 (10th Cir.1971); *Walstad v. University of Minnesota Hospitals*, 442 F.2d 634, 641–642 (8th Cir.1971).

The major factors considered by these courts in determining whether a public university is an "arm of the State" for purposes of Eleventh Amendment immunity include the status of the university under state law, the degree of autonomy that the university exercises over its own operations, and whether any judgment against the university would have to be paid out of the state treasury.

■ It is evident from a consideration of these factors that the University of Connecticut is indeed an "arm" of the State of Connecticut. Significantly, the Connecticut Supreme Court has held that the doctrine of sovereign immunity bars suits for damages against the university in state court. *See Fetterman v. University of Connecticut*, 192 Conn. 539, 552, 473 A.2d 1176 (1984).

Moreover, of the nineteen members of the university's Board of Trustees, three are state officials (the governor, the commissioner of education and the commissioner of agriculture) and twelve are appointed by the governor for six-year terms. *See* C.G.S. § 10a–103. The General Assembly retains the right under the Connecticut Constitution to alter "the size, number, terms and method of appointment" of the Board of Trustees. *See* Conn. Const. art. 8, § 2. Accordingly, the Board of Trustees is clearly accountable to the political branches of the state government.

Furthermore, all tuition funds received by the university must be deposited into the state treasury pursuant to C.G.S. § 4–32. *See* Affidavit of Joe Ann M. Shaffer (filed April 30, 1985) ("Shaffer Affidavit") ¶ 8. These funds can be expended by the university only as authorized by the Governor and the General Assembly. *See* C.G.S. §§ 10a–8, 10a–105; Shaffer Affidavit ¶¶ 9–17. Accordingly, any financial liability incurred by the university as a result of this lawsuit would most likely have to be paid out of the state treasury.

In sum, the defendants having offered substantial evidence that the University of Connecticut is an "arm of the State" and the plaintiff having offered no evidence to

---

2. A state's sovereign immunity may be abrogated by an act of Congress or the state legislature. However, the courts have held that Congress has not abrogated the states' immunity from suit under 42 U.S.C. §§ 1981 and 1983, *see, e.g., Quern v. Jordan*, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979) (Section 1983); *Rucker v.*

*Higher Education Aids Board*, 669 F.2d 1179, 1184 (7th Cir.1982) (Section 1981); *Daisernia v. State of New York*, 582 F.Supp. 792, 799 (N.D. N.Y.1984) (Section 1981), and there is no indication that the State of Connecticut has waived its sovereign immunity under those statutes.

the contrary, the court holds that the Eleventh Amendment bars the plaintiff from maintaining any suit against the university in federal court.

### III. *Claims Against The Trustee Defendants*

#### A.

■ The plaintiff purports in his amended complaint to have brought suit against the trustees in both their official and individual capacities. *See* Amended Complaint ¶ 3; *cf.* Complaint (filed Sept. 28, 1984) ¶ 3 (describing trustees as "defendants in their official capacities"). However, the trustee defendants contend that they have been sued only in their official capacities, inasmuch as the plaintiff served process on the trustee defendants only through the Connecticut Attorney General.

It is conceded that such service was effective against the trustee defendants in their official capacities. A state or governmental entity thereof may be served with process "in the manner prescribed by the law of that state," *see* Rule 4(d)(6), Fed.R. Civ.P., and Connecticut law authorizes the Attorney General to accept service on behalf of the state and "any officer, servant, agent or employee of the state ..., *as such.*" C.G.S. § 52–64 (emphasis added). However, the trustee defendants were not served with process in their individual capacities by any of the methods authorized by Rules 4(d)(1), (6) and (7), Fed.R.Civ.P.

A similar situation was presented to the Court of Appeals in *Jackson v. Hayakawa*, 682 F.2d 1344 (9th Cir.1982), an action against members of the Board of Trustees of San Francisco State College. The original complaint as well as the first and second amended complaints appeared to sue the defendants only in their official capacities, whereas the third and fourth amended complaints stated in their captions that the defendants were sued in both their official and personal capacities. The third and fourth amended complaints were served on the California Attorney General, who was representing the trustees in their official capacities, but were not served on the

trustees personally or by any of the other methods authorized by Rule 4(d).

The Court of Appeals held that service of the third and fourth amended complaint on the Attorney General was insufficient to subject the trustees to suit in their individual capacities. Instead, because the individual trustees had never been personally served with notice of their new status in the lawsuit in accordance with the requirements of Rule 4(d), the district court properly asserted jurisdiction over the trustees only in their official capacities. *See id.* at 1348; *see also Martin v. New York State Department of Mental Hygiene*, 588 F.2d 371, 373 (2d Cir.1978) (per curiam) (holding that "Rule 4 mandates that [an individual] defendant be served with the summons and complaint personally, or in accordance with one of several prescribed alternatives" and that "[a] showing that the defendant has had actual notice of the lawsuit is not sufficient to bar a motion to dismiss"); 4 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 1109 (Supp.1985) ("If the suit is against a governmental officer in his individual, rather than official, capacity, then service on the chief executive officer will be insufficient to confer jurisdiction over that individual.").

The trustee defendants in the instant case likewise have not been served personally, or in accordance with one of several alternatives prescribed by Rule 4(d), with any complaint that asserts a claim against them in their individual capacities. Accordingly, this action shall be dismissed without prejudice against the trustee defendants in their individual capacities. *See Martin v. New York State Department of Mental Hygiene, supra,* 588 F.2d at 373, n. 4 (holding that "a dismissal for failure of service of process, of course, has no *res judicata* effect").

#### B.

The Eleventh Amendment and principles of sovereign immunity also limit the claims that may be asserted against the trustee defendants and defendant Roberts in their official capacities.

It has long been established that "when the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants." *Ford Motor Company v. Department of the Treasury*, 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945) ("*Ford Motor Company*"). Accordingly, the Supreme Court held in *Ford Motor Company* that where the petitioner "did not assert any claim to a personal judgment against [the individual defendants] for the contested tax payments," *id.*, but instead sought a refund of tax payments from the state treasury, the suit was one against the state that could not be heard in a federal court without the state's consent.

■ There is only one exception to this rule: A suit seeking prospective relief from a state official for a violation of federal constitutional rights is not considered to be a suit against the state. *See Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 102–103, 104 S.Ct. 900, 909, 79 L.Ed.2d 67 (1984) ("*Pennhurst*"), *citing Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Consequently, "when a plaintiff sues a state official alleging a violation of federal law, the federal court may award an injunction that governs the official's future conduct, but not one that awards retroactive monetary relief." *Pennhurst, supra*, 465 U.S. at 102–103, 104 S.Ct. at 909, *citing Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

■ The clear implication of *Ex parte Young* and its progeny is that the plaintiff may seek only injunctive relief against the trustee defendants (and defendant Roberts) in their official capacities for the asserted violations of his rights under federal law. Accordingly, inasmuch as all claims against the trustee defendants in their individual capacities have been dismissed for failure of service of process, *see* Part III-A, *supra*, the plaintiff can seek damages only against defendant Roberts.

### C.

■ The plaintiff's state law claims against the defendants in their official capacities stand on a different footing than his claims under federal law. That is because the exception to the Eleventh Amendment immunity of state officials applies only to claims of conduct contrary to "the supreme authority of the United States." *Pennhurst, supra*, 465 U.S. at 102, 104 S.Ct. at 909. In contrast,

> [a] federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment.

*Id.* at 106, 104 S.Ct. at 911. Accordingly, because "neither pendent jurisdiction nor any other basis of jurisdiction may override the Eleventh Amendment," *id.* at 121, 104 S.Ct. at 919, the plaintiff's state law claims against the trustee defendants (and defendant Roberts) in their official capacities must be dismissed.

The plaintiff seeks to distinguish *Pennhurst* on the ground that there was no diversity of citizenship between the parties to that case whereas there is diversity of citizenship between the parties to the case at bar. However, as the Supreme Court has recognized, the Eleventh Amendment

> deprives a federal court of power to decide certain claims against States that otherwise would be within the scope of Art. III's grant of jurisdiction.... The history of the adoption and development of the Amendment ... confirms that it is an independent limitation on *all* exercises of Art. III power: "the entire judicial power granted by the Constitution does not embrace authority to entertain a suit brought by private parties against a State without consent given," *Ex parte*

*State of New York,* 256 U.S. [490], at 497 [41 S.Ct. 588, at 589, 65 L.Ed. 1057]. *Pennhurst, supra,* 465 U.S. at 119–120, 104 S.Ct. at 918–19 (emphasis added). Accordingly, the court can find no basis for departing from the dictates of *Pennhurst* simply because the plaintiff has raised claims that otherwise would be within the scope of Article III's grant of diversity jurisdiction.

In sum, the claims against the trustee defendants in their individual capacities are dismissed for failure of service of process. The state law claims against the trustee defendants and defendant Roberts in their official capacities, as well as the claims for retrospective relief against these defendants in their official capacities for violation of the plaintiff's rights under federal law, are dismissed on Eleventh Amendment grounds.

### IV. *The Federal Claims*

The court turns now to the substantive grounds raised by the defendants in support of their motions to dismiss or for summary judgment.

For the purpose of a motion to dismiss for failure to state a claim upon which relief can be granted, the court must take the well-pleaded material allegations of the complaint as admitted. *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corporation,* 382 U.S. 172, 173–175, 86 S.Ct. 347, 348–49, 15 L.Ed.2d 247 (1965); *George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corporation,* 554 F.2d 551, 553 (2d Cir.1977). The court must construe the complaint liberally in the plaintiff's favor, *Scheuer v. Rhodes,* 416 U.S. 232, 236–237, 94 S.Ct. 1683, 1686–87, 40 L.Ed.2d 90 (1974), and may grant a motion to dismiss only if it is beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957); *see also McLain v. Real Estate Board of New Orleans, Inc.,* 444 U.S. 232, 246, 100 S.Ct. 502, 511, 62 L.Ed.2d 441 (1980).

In order to grant a motion for summary judgment, the court must find that there is no "genuine issue of material fact" and that "the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. In determining whether there is a material issue of fact, the court must "resolve all ambiguities and draw all inferences against the moving party." *Schwabenbauer v. Board of Education,* 667 F.2d 305, 313 (2d Cir.1981). However, the party opposing summary judgment " 'may not rest upon mere conclusory allegations or denials' as a vehicle for obtaining a trial," but instead "must bring to the district court's attention some affirmative indication that his version of relevant events is not fanciful." *Quinn v. Syracuse Model Neighborhood Corporation,* 613 F.2d 438, 445 (2d Cir.1980), *quoting SEC v. Research Automation Corporation,* 585 F.2d 31, 33 (2d Cir.1978).

### A.

█ The plaintiff contends in count one of his amended complaint that the defendants dismissed him from the program and denied him credit for his last year and a half as a neurosurgery resident on account of his race, alienage or national origin. He argues that these actions by the defendants deprived him of the equal protection of the laws in violation of the Fourteenth Amendment to the United States Constitution.

The defendants contend in support of their motion to dismiss or for summary judgment that the plaintiff has failed to establish the purposeful, intentional discrimination that is required in order to prevail on an equal protection claim. *See Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 272, 99 S.Ct. 2282, 2292, 60 L.Ed.2d 870 (1979) (official action "is unconstitutional under the Equal Protection Clause only if that impact can be traced to a discriminatory purpose"); *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) (same).

The plaintiff's affidavit states that Roberts suggested in November 1981 that Ban-

erjee return to India to practice neurosurgery and dropped Banerjee from the program as soon as he announced that he intended to remain in the United States. *See* Banerjee Affidavit ¶ 40. The affidavit also contains the text of a lecture given in 1974 by a colleague of Roberts in which it was stated that "we should limit ... foreign residents who come for neurosurgical training in order to remain here." *Id.*, Exhibit M. The court cannot conclude from this evidence, after "resolv[ing] all ambiguities and draw[ing] all inferences against the moving party," *Schwabenbauer v. Board of Education, supra,* 667 F.2d at 313, that there is no "genuine issue of material fact" as to whether Roberts intentionally discriminated against Banerjee on the basis of his race, alienage or nationality.

A defendant sued in his official capacity may be found liable under 42 U.S.C. § 1983 only when some governmental policy or custom was "the moving force" behind the violation of federal law. *Polk County v. Dodson,* 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981), *quoting Monell v. New York City Department of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978). However, a policy may arise from a single action by a subordinate official in a matter over which he has final decision-making authority. *See Rookard v. Health and Hospitals Corporation,* 710 F.2d 41, 45 (2d Cir.1983) (holding that transfer and discharge of employee by executives of municipal hospital constituted official policy). It has not been disputed in the instant case that Roberts had final authority to dismiss Banerjee from the program and to deny him credit for time that he had already served as a neurosurgery resident. The court therefore concludes that these actions by Roberts constituted an official policy that arguably could give rise to liability against the defendants in their official capacities.[3]

Accordingly, for the reasons stated above, the court must deny the motions of defendant Roberts and the trustee defendants to dismiss or for summary judgment with respect to count one of the amended complaint.

### B.

The plaintiff contends in count two of his amended complaint that the defendants deprived him "of his rights, privileges and immunities as secured by the Constitution and laws of the United States, including 42 U.S.C. § 1983, because of [his] race, alienage and national origin."

It is unclear from this language which substantive "rights, privileges and immunities" are intended to be asserted in this count. The court can only assume that the plaintiff is attempting to state a claim under either the privileges and immunities clause of Article IV, § 2 of the Constitution, the privileges and immunities clause of the Fourteenth Amendment, or 42 U.S.C. § 1983.

First, the privileges and immunities clause of Article IV "is designed to insure to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy." *Toomer v. Witsell,* 334 U.S. 385, 395, 68 S.Ct. 1156, 1162, 92 L.Ed. 1460 (1948). The plaintiff has not alleged that he was treated any differently by the defendants because he was a resident of Illinois rather than Connecticut. Indeed, the plaintiff appears to have been a resident of Connecticut during most, if not all, of the period at issue. It is therefore evident that the plaintiff has failed to state a claim for which relief can be granted under the privileges and immunities clause of Article IV.

Second, the privileges and immunities clause of the Fourteenth Amendment applies by its terms only to "persons born or naturalized in the United States." However, the plaintiff states that he "was born in India, is a citizen of India ... and a resident of the State of Illinois." Amended Complaint ¶ 1. Accordingly, the plaintiff

---

**3.** As discussed in Part III–B, *supra,* only prospective relief can be awarded against the trustee defendants and against defendant Roberts in his official capacity.

cannot claim any rights of national citizenship that may be protected by the privileges and immunities clause of the Fourteenth Amendment. *See generally Steigleder v. McQuesten,* 198 U.S. 141, 143, 25 S.Ct. 616, 617, 49 L.Ed. 986, 987 (1905) (observing that citizenship and residence are "wholly different things within the meaning of the Constitution").

■ Finally, as the Supreme Court held in *Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 618, 99 S.Ct. 1905, 1916, 60 L.Ed.2d 508 (1979), "§ 1983 does not provide any substantive rights at all" but merely "authorizes a cause of action based on the deprivation of civil rights guaranteed by other Acts of Congress." It is therefore evident that "one cannot go into court and claim a 'violation of § 1983' —for § 1983 by itself does not protect anyone against anything." *Id.* at 617, 99 S.Ct. at 1916.

Accordingly, the court concludes for the foregoing reasons that count two of the amended complaint must be dismissed for failure to state a claim upon which relief can be granted.

### C.

■ The third count of the amended complaint contends that "the defendants deprived Dr. Banerjee of his liberty and property rights without due process of law, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution." The defendants counter that the plaintiff had no protected liberty or property interest in remaining in the program or in receiving credit for his prior surgical experience or for the last year and a half of his neurosurgical residency; furthermore, they contend that, even if the plaintiff did possess a protected liberty or property interest, he was not deprived of that interest without due process of law.

The affidavits submitted by the parties reveal disputes of material fact sufficient to defeat the defendants' motion for summary judgment. Among the most significant of these issues are (1) what notice Banerjee was given of his alleged deficiencies as a neurosurgical resident before he was terminated from the program and denied credit for his past experience; (2) what discussions occurred between Banerjee and Roberts concerning the six months of credit that Banerjee believed that he was to receive for his overseas surgical experience; (3) what notice Banerjee was given of the possibility that he would not receive credit for his third year as a neurosurgical resident; (4) what discussions occurred between Banerjee and Roberts in October 1981, when they allegedly agreed that Banerjee would remain in the program for a full four years; (5) whether Banerjee was dismissed from the program and denied credit because of his deficiencies as a neurosurgeon or because of his race, alienage, nationality or public criticism of Roberts and his colleagues; and (6) the extent to which the unfavorable evaluations of Banerjee were made public. The record is also unclear as to the effect of the contract between Banerjee and the Hartford Hospital, which stated that Banerjee was to receive "an educational program ... in keeping with the standards established by the Council on Medical Education of the American Medical Association," on the relationship between Banerjee and the University of Connecticut.

Accordingly, the defendants' motion to dismiss or for summary judgment with respect to count three of the amended complaint must be denied.[4]

### D.

The plaintiff has also asserted a claim under 42 U.S.C. § 1981, which provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and

---

4. *See* Part IV–A, *supra* (discussion of why the actions of defendant Roberts constitute an official policy which may be sufficient to impose li-

ability against the trustee defendants in their official capacities).

enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens."

The defendants have raised the same argument in opposition to the plaintiff's Section 1981 claim as they previously raised with respect to his equal protection claim— namely, that the plaintiff has failed to establish the requisite purposeful discrimination. *See General Building Contractors Association v. Pennsylvania*, 458 U.S. 375, 391, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982) (holding that "§ 1981, like the Equal Protection Clause, can be violated only by purposeful discrimination"). Accordingly, for the reasons stated in Part IV–A, *supra*, the motion to dismiss or for summary judgment with respect to the plaintiff's Section 1981 claim is hereby denied.[5]

## V. *The Claims Under State Law*

The court turns now to the state law claims against defendant Roberts in his individual capacity after having dismissed such claims against the other defendants and against Roberts in his official capacity. *See* Parts II, III–A and III–C, *supra*.

It should be noted as a threshold matter that the court declines to abstain from deciding these issues of Connecticut law. The instant case presents none of the "exceptional circumstances" in which a federal court may properly decline to exercise or postpone the exercise of its jurisdiction. For example, this lawsuit does not seek to challenge the constitutionality of any state statute or regulation, *cf. Railroad Commission of Texas v. Pullman Company*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971

(1941), or to enjoin on-going state criminal or quasi-criminal prosecutions, *cf. Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), or to interfere with a state regulatory scheme, *cf. Burford v. Sun Oil Company*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943).

The Supreme Court has emphasized that to deny a litigant the opportunity to raise issues of state law in a federal diversity action "merely because the answers to the questions of state law are difficult or uncertain or have not yet been given by the highest court of the state, would thwart the purpose of the jurisdictional act." *Meredith v. Winter Haven*, 320 U.S. 228, 234– 235, 64 S.Ct. 7, 11, 88 L.Ed. 9 (1943). Furthermore, the Connecticut courts appear to have provided ample guidance for deciding most of the issues of state law that have been raised in this action. Accordingly, the court has concluded that the interests of the parties and the public in judicial economy are best served by adjudicating all of the plaintiff's remaining claims in this lawsuit.[6]

### A.

The plaintiff contends in count five of his amended complaint that he was subjected to unlawful discrimination in violation of the equal protection provisions of the Connecticut Constitution. Defendant Roberts raises the same arguments in opposition to this claim that he previously raised with respect to the plaintiff's claim under the equal protection clause of the Fourteenth Amendment.

The Connecticut Supreme Court has held that "[t]he equal protection and due pro-

---

5. The *Monell* standard for imposing liability on defendants sued in their official capacities as a result of violations arising out of an official policy or custom, *see* Part IV–A, *supra*, has also been applied in actions pursuant to 42 U.S.C. § 1981. *See, e.g., Des Vergnes v. Seekonk Water District*, 601 F.2d 9, 15 (1st Cir.1979); *McClure v. Esparza*, 556 F.Supp. 569, 571 (E.D.Mo.1983), *aff'd without opinion*, 732 F.2d 162 (8th Cir. 1984), *cert. denied*, — U.S. —, 105 S.Ct. 2111, 85 L.Ed.2d 477 (1985).

6. The court likewise sees no necessity to certify any of the pending questions of state law to the Connecticut Supreme Court pursuant to Connecticut Public Act 85–111. *See generally L. Cohen & Company, Inc. v. Dun & Bradstreet, Inc.*, 629 F.Supp. 1419, 1425 (D.Conn.1986) ("[t]he federal courts can best serve the important interests of comity, federalism and judicial economy underlying [Public Act 85–111] by exercising the 'judgment, restraint and discretion' to certify only those unusual questions that are particularly suitable for resolution by the Connecticut Supreme Court").

cess clauses of the federal constitution and the corresponding provisions of §§ 1 and 12 of article first of our state constitution have substantially the same meaning." *Snyder v. Town of Newton,* 147 Conn. 374, 381, 147 A.2d 770 (1960). *See also Local Union No. 35 v. City of Hartford,* 625 F.2d 416, 425 (2d Cir.1980), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981) (same). The same dispute of material fact that precludes summary judgment on the plaintiff's federal equal protection claim, *see* Part IV–A, *supra,* therefore precludes summary judgment on his claim under the equal protection provisions of the Connecticut Constitution.

Accordingly, the motion to dismiss or for summary judgment with respect to count five of the amended complaint is hereby denied.

### B.

The sixth count of the amended complaint alleges a breach of a contract entered into between Banerjee and Roberts (on behalf of the university) whereby Banerjee was to have remained as a neurosurgery resident at the University of Connecticut through June 30, 1982; the seventh count alleges that Roberts intentionally interfered with this contractual relationship between Banerjee and the university.

It is undisputed that the university offered the plaintiff a position as a fourth-year neurosurgery resident for the period July 1, 1981 through June 30, 1982. *See* Banerjee Affidavit ¶ 29 and Exhibit F. It is likewise undisputed that the plaintiff accepted the position only through December 31, 1981. *See id.* at ¶ 30 and Exhibit G. However, the plaintiff contends that, when he learned in October 1981 that he would not receive six months' credit for his prior medical experience, he and Roberts agreed that he would remain in the program until June 30, 1982. *See id.* at ¶¶ 38–39. It is this modified agreement that the plaintiff apparently contends was breached or intentionally interfered with by Roberts.

Roberts raises three arguments in support of his motion to dismiss or for summa-

ry judgment with respect to counts six and seven of the amended complaint. First, he argues that the law of contracts does not apply to the relationship between a student and his school. Second, he argues that, to the extent that any contractual relationship does exist between a student and his school, the relationship presupposes successful academic performance, which has not been established in the instant case.

A number of courts have recognized, however, that "there may be a cause of action for specific performance of a contract between a college and its students in proper circumstances." *Williams v. Howard University,* 528 F.2d 658, 660 (D.C. Cir.), *cert. denied,* 429 U.S. 850, 97 S.Ct. 138, 50 L.Ed.2d 123 (1976). *See generally* Fishbein, New Strings On The Ivory Tower, 12 J.Coll. & U.L. 381, 386 (1985) (noting "judicial willingness to engage in the legal fiction of 'locating' implied contracts in the private university setting"). The courts have nonetheless refrained from rigidly adhering to commercial contract doctrine in reconciling the interests of students and their universities. For example, the Court of Appeals observed in *Slaughter v. Brigham Young University,* 514 F.2d 622 (10th Cir.), *cert. denied,* 423 U.S. 989, 96 S.Ct. 202, 46 L.Ed.2d 131 (1975), that

*some* elements of the law of contracts are used and should be used in the analysis of the relationship between [the student] and the University.... This does not mean that "contract law" must be rigidly applied in all its aspects.... The student-university relationship is unique, and it should not be and cannot be stuffed into one doctrinal category.

*Id.* at 626. *See also Mahavongsanan v. Hall,* 529 F.2d 448 (5th Cir.1976) (holding that concept of "a binding, absolute unchangeable contract" is inappropriate in the academic setting in view of "the wide latitude and discretion afforded by the courts to educational institutions"); *cf. Zahorik v. Cornell University,* 729 F.2d 85, 92 (2d Cir.1984) (noting that "tenure decisions in an academic setting involve a combination of factors which tend to set them

apart from employment decisions generally").

■ Accordingly, a court that is asked to enforce an asserted "contract" between a student and his university must examine the oral and written expressions of the parties in the light of the policies and customs of the particular institution. It is only by examining the statements of the parties in their unique academic context that a court can determine the nature of any binding commitments that may have been entered into and the extent to which the party seeking enforcement has satisfied its own obligations under the contract. The necessity for individualized analysis of each asserted contractual relationship is amply demonstrated in the instant case, where Banerjee appears to have been in some respects a student of the university but in other respects an employee.

■ The record of this case is unclear with respect to such matters as the content of any discussions between Banerjee and Roberts in which commitments were allegedly made concerning Banerjee's participation in the program, the significance of the Essentials of Accredited Residencies to which reference was made in the contract between Banerjee and Hartford Hospital, the extent to which Banerjee met his obligations as a neurosurgery resident, and the precise relationship among Banerjee, the University of Connecticut and Hartford Hospital. It therefore cannot yet be determined whether any contractual relationship existed between Banerjee and the university that might have been breached or tortiously interfered with by Roberts. Accordingly, the motion to dismiss or for summary judgment must be denied with respect to counts six and seven of the amended complaint.

## C.

The eighth count of the amended complaint asserts that "defendant Roberts intentionally interfered with the prospective business and professional relationships between Dr. Banerjee and the other hospitals to whose neurosurgery programs he had

applied." The plaintiff contends that he was unable to gain admission to other neurosurgery residency programs after his dismissal from the University of Connecticut because Roberts had informed those programs of his alleged deficiencies as a neurosurgery resident. The only argument raised by Roberts in support of its motion to dismiss or for summary judgment on this count is that a cause of action for tortious interference with prospective business relationships cannot arise out of a relationship between a student and his university.

The common law of Connecticut "forbids unjustifiable interferences with any man's right to pursue his lawful business or occupation and to secure to himself the earnings of his industry." *Goldman v. Feinberg*, 130 Conn. 671, 674, 37 A.2d 355 (1944). However, a plaintiff can prevail under such a cause of action only by demonstrating that the defendant has willfully or wantonly engaged in wrongful conduct such as "fraud, misrepresentation, intimidation or molestation," *Kecko Piping Company, Inc. v. Town of Monroe*, 172 Conn. 197, 201, 374 A.2d 179 (1977), and that "except for the tortious interference of the defendant, there was a reasonable probability that the plaintiff would have entered into a contract or made a profit." *Goldman v. Feinberg, supra,* 130 Conn. at 675, 37 A.2d 355. Of course, a person who in good faith conveys an unfavorable appraisal of the academic or professional abilities of another cannot be held liable for intentional interference with a business expectancy. *See Kecko Piping Company v. Town of Monroe, supra,* 172 Conn. at 202, 374 A.2d 179 ("[o]ne is privileged purposely to cause another not to perform a contract, or enter into or continue a business relation, with a third person by giving honest advice to the other within the scope of a request made by him").

The court has found no Connecticut cases in which a plaintiff has asserted a claim of tortious interference with his efforts to secure employment. However, courts in other jurisdictions have recog-

nized that a cause of action for tortious interference with a professional or business expectancy may exist in such circumstances. *See, e.g., Hennessey v. National Collegiate Athletic Association,* 564 F.2d 1136, 1143 (5th Cir.1977) (holding that under Alabama law a claim may be based upon "interference with the securing of employment"); *Kyriazi v. Western Electric Company,* 461 F.Supp. 894, 950 (D.N.J.1978), *vacated on other grounds,* 473 F.Supp. 786 (D.N.J.1979) ("[w]here one intentionally acts to deprive another of an economic benefit, including an employment relationship, the law of New Jersey confers a right of action on the party aggrieved"); *see generally* W. Prosser, Law of Torts 950 & n. 61 (1971) (observing that "for the most part the 'expectancies' thus protected [from tortious interference] have been those of future contractual relations, such as the prospect of obtaining employment"). The Connecticut Supreme Court appears to have contemplated such a cause of action in the employment context when it held that state law protects "any man's right to pursue his lawful business or occupation." *Goldman v. Feinberg, supra,* 130 Conn. at 674, 37 A.2d 355. Furthermore, the court sees no basis for categorically denying such protection to apprentices, management trainees, medical residents and others who receive training in the course of their paid employment.

■■■ The plaintiff contends that defendant Roberts' malicious misrepresentations prevented him from obtaining the economic benefits that he would have derived from a neurosurgery residency contract. The court concludes that such an allegation of bad faith interference with a professional expectancy states a claim for which relief can be granted under Connecticut law. Furthermore, in view of the disputes of material fact as to whether Roberts intentionally misrepresented the quality of Banerjee's work and whether Banerjee could have obtained another neurosurgery residence had it not been for any such intentional misrepresentations, the court is precluded from granting summary judgment on this claim.

**D.**

■■ The plaintiff asserts in counts nine and ten of his amended complaint that his dismissal from the program was wrongful and in violation of an implied covenant of good faith in his contract with the university. The Connecticut Supreme Court has held that claims for wrongful discharge and for discharge in violation of an implied covenant of good faith are to be governed by the same legal standard even though the former claim sounds in tort and the latter in contract. *See Magnan v. Anaconda Industries, Inc.,* 193 Conn. 558, 572, 479 A.2d 781 (1984) *("Magnan")*. Accordingly, a plaintiff can prevail on either claim only if his discharge involves "impropriety ... derived from some important violation of public policy." *Id., quoting Sheets v. Teddy's Frosted Foods, Inc.,* 179 Conn. 471, 475, 427 A.2d 385 (1980) *("Sheets")*.

The Connecticut Supreme Court permitted such a cause of action in *Sheets,* where the plaintiff who alleged that he had been fired for insisting that his employer comply with provisions of the Connecticut Uniform Food, Drug and Cosmetic Act, C.G.S. § 19–211 *et seq.* The rationale for the court's decision was that "an employee should not be put to an election whether to risk criminal sanction or to jeopardize his continued employment." *Sheets, supra,* 179 Conn. at 480, 427 A.2d 385. The court has since refused further "to enlarge the circumstances under which an at-will employee may successfully challenge his dismissal." *Magnan, supra,* 193 Conn. at 572, 479 A.2d 781.

The plaintiff does not allege in counts nine and ten of the amended complaint that he was faced with a choice of "whether to risk criminal sanction or to jeopardize his continued employment." *Sheets, supra,* 179 Conn. at 480, 427 A.2d 385. Instead, he merely reasserts the same claims of wrongful discrimination and denial of due process of law that already appear in counts one, two, four and five of his amended complaint.

The only laws invoked in these counts that have not been specifically invoked elsewhere in the amended complaint are the prohibitions against employment discrimination of C.G.S. §§ 46a–58(a) and 46a–60 (a)(1) and the "anti-blacklisting" provisions of C.G.S. § 31–51. However, a plaintiff cannot bring suit directly for a violation of C.G.S. §§ 46a–58(a) and 46a–60(a)(1) without having first exhausted his administrative remedies in proceedings before the Connecticut Human Rights Commission. *See Sullivan v. Board of Police Commissioners of the City of Waterbury*, 196 Conn. 208, 215–216, 491 A.2d 1096 (1985). Furthermore, there is no indication in the record that the plaintiff's dismissal itself involved any violation of C.G.S. § 31–51, inasmuch as the plaintiff contends that he was "blacklisted" only *after* his dismissal when he began to apply to other neurosurgery residency programs. *See* Banerjee Affidavit ¶¶ 43–47.

█ It is evident that the Connecticut Supreme Court in *Sheets* did not intend to create a means for discharged employees to assert the same statutory or constitutional violations twice in a single complaint or to circumvent the procedural requirements of the state human rights statutes. Instead, the court intended merely to provide "a modicum of judicial protection," *Sheets, supra,* 179 Conn. at 477, 427 A.2d 385, for those who did not already have a means of challenging their dismissals under state law. Accordingly, because the court declines to extend the holding of *Sheets* in a manner that could not have been contemplated by the Connecticut Supreme Court, the motion to dismiss or for summary judgment with respect to counts nine and ten of the complaint is granted.

### E.

█ The plaintiff asserts in count eleven of his amended complaint that the conduct of defendant Roberts violated the Connecticut Unfair Trade Practices Act, C.G.S. § 42–110a *et seq.* ("CUTPA").

A plaintiff who seeks to prevail on a CUTPA claim must establish that the defendant engaged in "unfair or deceptive acts or practices *in the conduct of trade or commerce.*" C.G.S. § 42–110b (emphasis added). The statute defines "trade or commerce" as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services, and any property . . . and any other article, commodity or thing of value in this state." C.G.S. § 42–110a.

This court has previously held that, "[a]lthough an employer may engage employees for the purpose of promoting trade or commerce, the actual employment relationship is not itself trade or commerce for the purposes of CUTPA." *Rolf Andersen v. E & J Gallo Winery*, Civil No. H 85–295 (JAC), Ruling on Motion to Dismiss (D.Conn. Nov. 7, 1985), slip op. at 16 [Available on WESTLAW, DCTU database], *citing Manning v. Zuckerman*, 388 Mass. 8, 13, 444 N.E.2d 1262 (1983) (construing similar Massachusetts statute). *See also Collins v. Gulf Oil Corporation*, 605 F.Supp. 1519, 1523 (D.Conn.1985) (same).

Accordingly, even accepting the plaintiff's argument that his relationship with the university was primarily that of an employee to his employer rather than of a student to his school, the court concludes that this relationship does not fall within the definition of "trade or commerce" under CUTPA. The motion to dismiss or for summary judgment must therefore be granted with respect to count eleven of the amended complaint.

### F.

█ The final count of the amended complaint asserts that Roberts is "estopped" from dismissing the plaintiff from the program because "Dr. Banerjee continued his employment as a neurosurgery resident in reliance on the explicit or implicit representations by defendant Roberts that he would be eligible for Board certification if he successfully completed the neurosurgery residency program." The Connecticut Supreme Court has frequently held that "equitable estoppel is

available only for protection and cannot be used as a weapon of assault." *Dickau v. Town of Glastonbury,* 156 Conn. 437, 442, 242 A.2d 777 (1968), *quoting Hebb v. Zoning Board of Appeals,* 150 Conn. 539, 543, 192 A.2d 206 (1963). Accordingly, inasmuch as the plaintiff has improperly invoked the doctrine of estoppel as "a weapon of assault," the court must grant the motion to dismiss or for summary judgment with respect to count twelve of the amended complaint.

### Conclusion

For the reasons stated above, the defendants' motions to dismiss or for summary judgment are granted with respect to (1) all claims against the University of Connecticut, *see* Part II, *supra;* (2) all claims against the trustee defendants in their individual capacities, *see* Part III–A, *supra;* (3) all claims for damages against the trustee defendants and defendant Roberts in their official capacities, *see* Part III–B, *supra;* (4) all claims for injunctive relief for violations of state law against the trustee defendants and defendant Roberts in their official capacities, *see* Part III–C, *supra;* and (5) counts two, nine, ten, eleven and twelve of the amended complaint against all remaining defendants, *see* Parts IV–B, V–D, V–E and V–F, *supra.* The motion to dismiss or for summary judgment is denied with respect to counts one, three and four against defendant Roberts in his official and personal capacities and against the trustee defendants in their official capacities and with respect to counts five, six, seven and eight against defendant Roberts in his personal capacity. *See* Parts IV–A, IV–C, IV–D, V–A, V–B and V–C, *supra.* The final pretrial order shall be submitted jointly by counsel in the form prescribed by the court by no later than October 1, 1986.

It is so ordered.